**Richard A. CARROLL, Jr., Appellant,**

v.

**CITY OF PHILADELPHIA, BOARD OF PENSIONS AND RETIREMENT MUNICIPAL PENSION FUND.**

Commonwealth Court of Pennsylvania.

Argued March 8, 1999.

Decided June 16, 1999.

Publication Ordered Aug. 9, 1999.

**142**

Richard A. Carroll, Jr., appellant, pro se.

1. Plan J was created by a City ordinance, entitled the Retirement System Ordinance, adopted on December 3, 1956 (the 1956 Ordinance).

Mark R. Zecca, Philadelphia, for appellee.

Before DOYLE, J., McGINLEY, J., and JIULIANTE, Senior Judge.

DOYLE, Judge.

Richard A. Carroll, Jr. appeals from an order of the Court of Common Pleas of Philadelphia County, which affirmed a decision of the City of Philadelphia Board of Pensions and Retirement (Board) denying his request to change the classification of his pension plan.

Carroll began working for the City of Philadelphia (City) in 1977 as a Clerk Typist for City Council. In that position, he was enrolled in Pension Plan J (Plan J),[1] which gave Carroll the opportunity to retire at age 55 and receive pension payments equal to approximately 50% of his final salary. Carroll left his clerk typist position on January 14, 1978, and he received a refund of his pension contributions.

On February 21, 1978, Carroll was appointed and classified as a Prosecutor II with the City's District Attorney's Office. He again became a member of Plan J. Carroll resigned from that position approximately nine years later, on January 29, 1987, and he again applied for and received a refund of his Plan J pension contributions.[2]

However, on January 8, 1987, shortly before Carroll left City employment, City Council enacted an ordinance entitled Municipal Retirement System Benefit Plan 1987 (87 Plan). At that time the City's pension system was financially distressed, and the City enacted the 87 Plan to reduce pension costs and to qualify for financial assistance from the Commonwealth. The new pension plan would generally apply to

2. Section 213.2 of the 1956 Ordinance specifically provides that "[u]pon refund of . . . contributions, all rights of the employee or any beneficiary under the ordinance shall cease and determine."

all employees hired or appointed after January 1, 1987. Under the terms of the 87 Plan, employees who separated from City employment and did not leave their contributions in Plan J, and who were then re-employed with the City after January 8, 1987, would belong to Pension Plan M (Plan M).[3] Plan M is less generous than Plan J, paying a retiree 40% of his or her final earnings and setting an employee's retirement age at 60 years.

On May 18, 1987, Carroll was rehired by the District Attorney's Office and should have been enrolled in Plan M. The City's Finance Department, however, erroneously began to make pension payroll deductions at the Plan J rate, rather than the Plan M rate, and his pay stubs indicated that he was in Plan J. The payroll deduction for Plan J is higher than the deduction for Plan M.

When the City rehired Carroll, he was told by the District Attorney's Office that he was to return to City employment under the same terms that governed his employment prior to his January 1987 resignation. But, the City made no specific representations to Carroll regarding his pension plan.

Approximately eight months after Carroll was rehired, on January 6, 1988, the Board Clerical Support Unit sent Carroll a memorandum informing him of the following:

> Because your re-employment occurred on 5–18–87, you have been placed in a new pension plan which is different from the plan to which you previously belonged. As a result, rather than repay the amount which you withdrew, you will be charged at the contribution rate of the new plan.
> . . . .

> In order to avail yourself of this opportunity to buy back your prior service credit, you must return the memorandum at the bottom of this letter before 5–17–88. After that date, you will lose forever the right to buy credit for your prior service.

(Board Memorandum at 1; Reproduced Record at 26a.) (Emphasis in the original.) Carroll never responded to this memorandum.

On April 2, 1996, Carroll sent a letter to the Board asking to repurchase approximately nine years of his employment time at the District Attorney's office, as well as three years of military service time. Upon receipt of this letter, the Board reviewed its records and discovered that Carroll was erroneously listed as a member of Plan J and should have been recorded as being a member of Plan M. The Board corrected its records to place Carroll in Plan M. Further, because Carroll was erroneously being charged at the Plan J rate and had overpaid his retirement contributions since he was rehired in 1987, the Board refunded to Carroll $11,096.22, the difference between the higher Plan J payroll deductions and the Plan M deduction. The Board, however, did not pay Carroll interest on the excess monies that it had collected. Despite Carroll's failure to respond to the Board's 1988 memorandum and make a timely request to purchase his prior service with the District Attorney's office, the Board's Executive Director gave him special permission to repurchase his prior years of municipal service in addition to his military time and apply those years to Plan M. Carroll took advantage of this opportunity and purchased a little more than nine years of his prior municipal service plus military time and vested in Plan M.

---

**3.** Section 106.1 of the 87 Plan, states that:
> All separated employees who become reemployed by the City on or after January 8, 1987, become subject to the provisions of Plan 87, except those employees . . . who, upon separation from employment with the City when covered by another plan, [and

who] did not withdraw their pension contributions shall be subject to the provisions of the plan covering them when they separated from service with the City. . . .

Plan M is the name for the provisions of the 87 Plan for the City's non-uniformed employees.

On September 19, 1996, Carroll sent a letter to the Executive Director of the Board challenging the Board's determination that he was a member of Plan M. He requested that his pension and retirement status be governed by the terms of Plan J. The Board conducted a hearing at which time Carroll argued that the principle of equitable estoppel precluded the Board from denying him membership in Plan J. He asserted that he relied to his detriment on a notation on his pay stub indicating that he was in Plan J and denied ever receiving the Board's January 6, 1988 memorandum. Carroll also argued that he was entitled to interest on the excess pension contributions he made at the Plan J rate. The Board denied his appeal.

Carroll then appealed the Board's order to the Common Pleas Court. The Court affirmed the Board's decision to deny Carroll membership in Plan J, but determined that Carroll was entitled to six-percent interest on the approximately $11,000 in overpaid pension contributions. This appeal followed.

On appeal, Carroll contends that the Board should, under the doctrine of equitable estoppel, be precluded from denying him admission into Plan J, because the Board, contrary to the City's pension ordinances, withheld Plan J pension contributions from his salary. He asserts that the Board misrepresented his pension plan status as Plan J for almost a decade, inducing him to remain employed by the City, and that he relied on the misrepresentation to his detriment. Carroll also contends that the Common Pleas Court erred in fixing interest on his excess pension contribution at six-percent and that the Board, in order to prevent the unjust enrichment of the pension fund, should be required to pay interest consistent with the fund's earnings.

█ In *Quinn v. Department of State, Bureau of Professional & Occupational Affairs,* 168 Pa.Cmwlth. 447, 650 A.2d 1182 (1994), we explained the doctrine of equitable estoppel as follows:

... [E]quitable estoppel prevents a party from acting differently than the manner in which it induced another party to expect.... The doctrine may be applied to a Commonwealth agency when the party asserting estoppel establishes by clear, precise unequivocal evidence that: (1) the agency intentionally or negligently misrepresented a material fact; (2) the agency knew or had reason to know that the party would justifiably rely on the misrepresentation; and (3) the party acted to his or her detriment by justifiably relying on the misrepresentation....

Mere argument or doubtful inference is insufficient to establish the critical element of changing one's position to his or her detriment....

*Id.* at 1184 (citations omitted). Further, because equitable estoppel is a doctrine of equity and fundamental fairness, its applicability depends on the specific facts of each case. *Id.*

█ Generally, a party may not assert equitable estoppel to prevent the application of a statutory provision. *Finnegan v. Public School Employes' Retirement Board,* 126 Pa.Cmwlth. 584, 560 A.2d 848 (1989), *aff'd,* 527 Pa. 362, 591 A.2d 1053 (1991). With regard to that principle, our Supreme Court has stated:

[T]he Commonwealth or its subdivisions and municipalities cannot be estopped by 'the acts of its agents and employees if those acts are outside the agents' powers, in violation of positive law, or acts which require legislative or executive action.'

*Central Storage & Transfer Co. v. Kaplan,* 487 Pa. 485 at 489, 410 A.2d 292 at 294 (1979) (quoting *Kellams v. Public School Employees Retirement Board,* 486 Pa. 95, 100, 403 A.2d 1315, 1318 (1979)). Allowing a party to prevent the application of a statute based on an error of a government employee is tantamount to giving the employee's error the effect of amending the statute. *Finnegan.*

In *Finnegan,* a teacher wished to purchase 15 years of service in order to qualify for an early retirement window available to employees with 30 or more years of service. Although the relevant statute allowed employees to purchase a maximum of 12 years service, representatives of the pension fund erroneously told Finnegan that she could purchase 15 years of service. Relying on the statements of the pension fund representatives, Finnegan submitted an application to purchase 15 years of service and retired on the belief that she would have, with the addition of the 15 purchased years, a total of 30 years of service. Thereafter, the pension fund allowed her to purchase only 12 years of service, which prevented her from qualifying for the early retirement window and reduced her monthly benefits.

Despite the fact that Finnegan established every element of equitable estoppel, the *Finnegan* Court held the pension fund could not be estopped from asserting the statutory provision that limited employees to purchasing a maximum of 12 years of service. We reasoned that the erroneous statements of the pension fund representatives could not override the statute, regardless of the fact that Finnegan relied on them to her detriment; to hold otherwise would allow the errors of the fund representatives to, in essence, amend the substance of the statute. *Accord Cosgrove v. State Employes' Retirement Board,* 665 A.2d 870 (Pa.Cmwlth.1995) (statute prevented retiree from changing a retirement benefit option election, even when the retiree was misled by retirement authorities).

In the present case, Carroll resigned from City employment on January 29, 1987, and he received a refund of all his pension contributions, thereby terminating his Plan J pension. Section 213.2 of the 1956 Ordinance (see footnote 2 *supra*). When he returned to work with the City on May 18, 1987, however, Carroll's pension benefits were governed by a different City ordinance, the 87 Plan, because the City rehired Carroll after January 8, 1987. Section 106.1 of the 87 Plan (see footnote 3 *supra*). Hence, it is clear that, as a matter of law, Carroll cannot be a member of Plan J, but rather the terms of his pension are controlled by the provisions of Plan M.

■ Even assuming for the sake of argument that Carroll proved each element of the doctrine of equitable estoppel, to apply that doctrine here would violate the 87 Plan, a City ordinance, and grant Carroll benefits beyond those he is entitled to under that pension ordinance. Therefore, following *Central Storage* and *Finnegan,* we are constrained to hold that we may not, based on the errors of City employees, apply the doctrine of equitable estoppel to override the 87 Plan and allow Carroll to receive Plan J benefits. As we observed in *Finnegan,* to hold otherwise would be tantamount to amending the 1987 Plan, solely because certain City employees made a clerical error and listed Carroll as a member of Plan J.[4]

4. Even if *Finnegan* was not controlling, the facts in this case militate against the application of equitable estoppel against the Board.

While Carroll's pay checks from the City indicated that he was in Plan J, the Board, which is an independent entity under Section 3.3–803 of the Philadelphia Home Rule Charter, made no misrepresentations to Carroll. And we also note that, when the City rehired Carroll, the District Attorney's office never specifically represented to Carroll that he would be a member of Plan J.

In addition, the Board found as fact that Carroll was sent a memorandum in January of 1988 informing him that he was "placed in a new pension plan" as a result of his re-employment. (Board's finding of fact No. 6.) The Board also found that the 87 Plan was widely advertised and discussed at public meetings, and, for that reason, concluded that Carroll was on notice of the existence of the Plan. Thus, based on these findings, we believe that Carroll either knew or should have known that he was not a participant in Plan J.

Further, Carroll claims, among other things, that he relied to his detriment on the misrepresentation on his pay checks that he was in Plan J, because the misrepresentation induced him to remain a City employee. This claim, however, is speculative and is undercut

Carroll argues, however, that equitable estoppel may be asserted against the City, even if its application would violate the Plan 87 ordinance, to prevent him from being subjected to a fundamental injustice. In Carroll's view, he will suffer a fundamental injustice, because, "in addition to substantial pecuniary loss the decision [of the Board] will cost [him] years of valuable *time* in carrying out his professional and personal plans, at a point in his life when time becomes increasingly important." (Carroll's brief at 8.) (Emphasis in the original.) We cannot agree.

Carroll is correct that equitable estoppel has been applied against the Commonwealth, despite the fact that the acts of its agents are in violation of positive law, to protect against a fundamental injustice. *Chester Extended Care Center v. Department of Welfare*, 526 Pa. 350, 586 A.2d 379 (1991); *Cameron Manor, Inc. v. Department of Public Welfare*, 681 A.2d 836 (Pa. Cmwlth.1996). The fundamental injustices in *Chester* and *Cameron*, however, involved unusual situations where Commonwealth agencies committed acts that unfairly lulled medical assistance providers into assuming substantial costs of medical treatment for the indigent.

Unlike *Chester* and *Cameron*, the record in this case does not reveal that Carroll had been subjected to any unfair act of the Board that would rise to the level of a fundamental injustice. Instead, this case involves a simple clerical error by the City Finance Department, which the Board, in good faith, attempted to remedy. When the Board learned that Carroll was erroneously listed as a member of Plan J, it promptly refunded his excess contributions. Furthermore, despite the fact that the time period for purchasing prior years of service had expired in 1988, the Executive Director of the Board gave Carroll special permission to purchase his prior years of municipal service and his military

time (a total of twelve years) and apply that time to Plan M.

Therefore, for all the above reasons, the Common Pleas Court correctly determined that the Board was not equitably estopped from denying Carroll admission into Plan J.

Carroll also challenges the decision of Common Pleas decision to award him only six-percent interest on the excess pension contributions he paid to the Board. Carroll contends that six-percent interest does not constitute just compensation for the taking of his property, and he asks us to order the Board to pay him interest at the commercial lending rate or to disgorge the earnings accrued by the Board's pension fund. He cites to eminent domain cases, which hold that delay damages for the period that payment is detained should be calculated using prevailing commercial loan rates. *Hughes v. Department of Transportation*, 514 Pa. 300, 523 A.2d 747 (1987); *Hagan v. East Pennsboro Township*, 713 A.2d 1187 (Pa.Cmwlth.1998).

■■■ The legal rate of interest, however, is set by Section 202 of the Act of January 30, 1974 (Act), P.L. 13, *as amended*, 41 P.S. § 202, which provides:

> Reference in any law or document enacted or executed heretofore or hereafter to 'legal rate of interest' and reference in any document to an obligation to pay a sum of money 'with interest' without specification of the applicable rate shall be construed to refer to the **rate of interest six per cent per annum**. (Emphasis added.)

The six-percent rate is applied to, among other things, contract matters where the parties have not specified another rate, and in particular to the award of prejudgment interest. *Daset Mining Co. v. Industrial Fuels Corp.*, 326 Pa.Super. 14, 473 A.2d 584 (1984). The legal rate of interest is simple interest and may not be com-

---

by the fact that Carroll remained a City employee after he discovered that he was actual-

ly in Plan M and by the fact that Carroll bought additional time and vested in Plan M.

pounded. *In re Estate of Braun,* 437 Pa.Super. 372, 650 A.2d 73 (1994).

We do not agree with Carroll that interest on his overpaid contributions should be calculated at the commercial lending rate, following the rule developed for determining delay damages in eminent domain cases. This case has nothing to do with compensation for government takings of real property, but rather is connected to Carroll's right to salary and benefits under his employment contract with the City. Carroll is seeking interest because his pension overpayments improperly reduced his salary and gave the pension plan the free use of his money. Also, the object of Carroll's appeal to the Board and this Court was to secure his right to receive a certain type of pension, which he believes he is entitled to as a fringe benefit of his employment.

■ The six-percent statutory rate applies in contractual matters, *Daset,* and neither party asserts that any ordinance, statute or contract sets a different level of interest to be paid on excess pension contributions. Therefore, we conclude that the Common Pleas Court correctly awarded Carroll six-percent interest on his excess contributions in accordance with Section 202 of the Act.[5] *See City of Reading v. Feltman,* 127 Pa.Cmwlth. 618, 562 A.2d 926 (1989) (common pleas court correctly awarded retirees six-percent interest on unpaid pensions, because the case was in the nature of mandamus, and interest is an element of damages where a writ of mandamus directs the payment of money); *see also Wheeling Pittsburgh Steel Corp. v. West Penn Power Co.,* 122 B.R. 29 (Bankr. W.D.Pa.1990) (where manufacturer over-

paid a utility under the terms of a service agreement, the manufacturer was entitled to interest at the legal rate of six-percent on the overpayment).

Accordingly, the Common Pleas Court's order is affirmed.

### ORDER

NOW, June 16, 1999, the order of the Court of Common Pleas of Philadelphia County in the above-captioned matter is hereby affirmed.

---

5. The United States Court of Appeals for the Third Circuit in *Peterson v. Crown Financial Corp.,* 661 F.2d 287 (3d Cir.1981), held that an award of interest in Pennsylvania could exceed the six-percent level in Section 202 of the Act, if the claim sounded in restitution. Carroll, however, does not argue that this matter sounds in restitution. Also, this case is not an action in equity, but is rather an appeal of an administrative action to determine Carroll's right to pension benefits.

Furthermore, we agree with the Board that, when the Board allowed Carroll to purchase all his prior time, it conferred on him a substantial benefit that "far exceeds any increased amount of interest which he could argue for." (Board's brief at 39.) Hence, even if the Common Pleas Court had the discretion to award more than six-percent interest, it did not err in refraining from exercising its discretion under these facts.